IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| MEDIANEWS GROUP, INC., and KEARNS-TRIBUNE, LLC,<br><br>    Plaintiffs/Counterclaim Defendants,<br><br><br>    vs.<br><br><br>PHILIP G. McCARTHEY, THOMAS K. McCARTHEY, SARAH J. McCARTHEY, SHAUN P. McCARTHEY, and MAUREEN P. McCARTHEY,<br><br>    Defendants/Counterclaim and Third-Party Plaintiffs,<br><br><br>    vs.<br><br><br>DESERET NEWS PUBLISHING COMPANY; DESERET MANAGEMENT CORPORATION; AT&T CORPORATION; COMCAST CORPORATION; DIRKS, VAN ESSEN & MURRAY; GARY GOMM; and JOHN/JANE DOES 1-25,<br><br>    Third-Party Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:03-CV-176 TC |

Plaintiffs Kearns-Tribune, LLC (KTLLC) and MediaNews Group, Inc. (MNG) currently own the newspaper *The Salt Lake Tribune*.  But the *Tribune* used to be owned by the Kearns-Tribune Corporation (KTCorp), which was controlled by the Defendants (and siblings) Philip, Thomas, Sarah, Shaun, and Maureen McCarthey (the McCartheys' great grandfather acquired the

*Tribune* in 1901).  The McCartheys want the newspaper back.

At the center of this controversy is what the McCartheys call the "Family Agreement." According to the McCartheys, the Family Agreement is a collateral oral agreement formed in connection with a 1997 merger between the *Tribune*'s then-owner KTCorp and Tele-Communications, Inc. (TCI).  They claim that they have individual rights to re-purchase the newspaper through an option created by the Family Agreement.  The McCartheys claim that the Family Agreement—purportedly between the individual members of the McCarthey family on the one hand, and KTCorp and TCI on the other hand—has been breached.  The parties opposing the McCartheys' claims primarily contend that no such enforceable Family Agreement exists separate and apart from written merger-related documents.

KTLLC and MNG filed this declaratory judgment action to resolve the McCartheys' claims.[1]  In response to the complaint, the McCartheys filed counterclaims against MNG and KTLLC and filed a third-party complaint against Deseret News Publishing Company (DNPC) (publisher of a competitor newspaper in Utah); Deseret Management Corporation (DMC) (owner of DNPC); AT&T Corporation (former owner of the *Tribune*); Comcast Corporation (former owner of the *Tribune* in connection with AT&T); Dirks, Van Essen & Murray (newspaper broker and appraiser); and R. Gary Gomm (a former DNPC consultant).

This matter comes before the court on the Plaintiffs/Counterclaim Defendants' and Third-

---

[1]This case is separate from, but related to, two other cases filed in this district:  Salt Lake Tribune Publishing Company v. AT&T Corporation (2:00cv936) (currently closed administratively), and Salt Lake Tribune Publishing Company v. Management Planning Inc. (2:03cv565) (currently on appeal to the Tenth Circuit).

Party Defendants' motions to dismiss or for summary judgment.[2]  For the reasons set forth

below, the court holds, based on the undisputed factual evidence and integration clauses in the

written merger documents, that no collateral oral Family Agreement exists.  And even if such an

agreement was formed, it is unenforceable because it violates the Statute of Frauds.  As a

consequence of the court's ruling regarding the Family Agreement, and for other reasons as well,

the McCartheys' remaining tort and equitable claims fail as a matter of law.  Accordingly, the

Plaintiffs/Counterclaim Defendants' Motion for Summary Judgment and the Third-Party

Defendants' motions to dismiss or for summary judgment are granted.

## FACTUAL BACKGROUND[3]

In 1995, a merger between KTCorp and TCI was initially proposed.  At the time, KTCorp

owned *The Salt Lake Tribune*.  Merger discussions continued through 1996.  The McCartheys,

who collectively were shareholders and directors of KTCorp, had enough stock and voting power

as a group to vote down the proposed merger.  And they were ready to use their power to defeat

the merger because they did not want to lose their family legacy in the *Tribune*.  In fact, during a

January 23, 1997 KTCorp Board meeting on the proposed merger, the "no" vote of the

McCarthey siblings on the board (Thomas, Philip, and Sarah) prevented any merger plans from

_____

[2]Specifically, the motions are: (1) KTLLC's and MNG's Motion for Summary Judgment;
(2) Dirks, Van Essen & Murray's joinder in the KTLLC/MNG motion for summary judgment;
(3) DNPC's Motion for Summary Judgment; (4) DMC's Motion to Dismiss, or in the
Alternative, Motion for More Definite Statement; (5) AT&T's and Comcast's Motion to Dismiss
and Joinder in Motions for Summary Judgment filed by KTLLC/MNG and DNPC; and (6) R.
Gary Gomm's Motion for Summary Judgment, or, in the Alternative, Motion to Dismiss.  Also
pending are the McCarthey Family's Request for Judicial Notice of Adjudicative Facts and the
McCarthey Family's Motion for Leave to Supplement the Record.

[3]This section is only a summary of the case's very involved factual background.  More
detailed facts are set forth in other parts of this Order as necessary to explain the ruling.

going forward.

After the proposed merger was voted down by the three McCarthey siblings, John Gallivan—who was a member of the KTCorp and TCI boards, as well as trustee of a McCarthey family trust and advisor to the McCartheys—negotiated on behalf of the McCartheys a "deal" with John Malone, CEO of TCI, under which the McCartheys agreed to vote for the merger if certain conditions were met by KTCorp and TCI.  According to the McCartheys, Mr. Gallivan and Mr. Malone were "accustomed to dealing with [each other] on a handshake basis . . . [and] it was not necessary to reduce their mutual understandings and agreements to writing." (McCartheys' Opp'n to KTLLC/MNG Mot. Summ. J. [hereinafter "McCartheys' Opp'n"] ¶ 24.)

That "deal" formed the rough contours of what the McCartheys now allege is the Family Agreement.  Generally, they claim that in exchange for their agreement to vote for the merger and convey their KTCorp shares, they were promised that a new entity, yet to be created by them, would be given an option to re-purchase the *Tribune* at fair market value five years later, during which time the new entity would continue to manage the newspaper.

The McCarthey board members then changed their stance and voted in February 1997 and April 1997 to approve the proposed merger based on the assurances that Mr. Gallivan communicated to them from Mr. Malone.  The merger was eventually approved by the KTCorp Board and the KTCorp shareholders.

The merger transaction was memorialized, in relevant part, in five written documents: the Voting Agreement, the Merger Agreement, the Proxy Statement, the Management Agreement, and the Option Agreement.  First, on April 18, 1997, TCI and certain majority shareholders of KTCorp entered into the Voting Agreement.  The shareholder signatories to the Voting

4

Agreement were James P. Kearns, Loretta M. Kearns (as Trustee under the Patricia Louis Kearns

Trust), and, most important, Jane McCarthey (as Trustee under the McCartheys' Qualified

Terminable Interest Property (QTIP) Trust for the benefit of Jane, Thomas, Philip, Sarah, Shaun,

and Maureen McCarthey).  Jane McCarthey, the mother of the McCarthey siblings, signed the

Voting Agreement at the urging of her children.  The parties to the Voting Agreement agreed that

the signatory shareholders would vote their shares in favor of the merger and that TCI would

enter into the Merger Agreement with KTCorp.  On the same day, TCI and KTCorp executed the

Merger Agreement.

　　　　Also in April 1997, the McCartheys, along with a few other individuals associated with

KTCorp, formed the Salt Lake Tribune Publishing Company, LLC (SLTPC) for the specific

purpose of carrying out the objectives of the deal associated with the merger (that is, to enter into

and carry out the Option and Management Agreements).  From 1997 to 2000, the McCarthey

Family LLC (current members are Philip, Thomas, and Sarah McCarthey) was a member of

SLTPC and held forty percent of the company (four other owners held the remaining sixty

percent).  Since 2000, the McCarthey Family LLC has held ninety percent of SLTPC.  Although

Shaun and Maureen McCarthey, the other siblings, may have been involved in the formation of

SLTPC, they have no ownership or management interests in SLTPC.

　　　　On July 2, 1997, KTCorp issued the Proxy Statement to its shareholders.  The Proxy

Statement disclosed the details and anticipated results of the proposed merger.

　　　　On July 31, 1997, KTCorp and SLTPC entered into the Option Agreement, which gave

SLTPC an option to purchase the *Tribune* five years later.  Then KTCorp and SLTPC entered

into the Management Agreement, which allowed SLTPC to manage the *Tribune* until it could

exercise its 2002 option to purchase the newspaper.

But events did not occur as the McCartheys had planned.[4]  Now, almost nine years after the merger, neither SLTPC nor the McCartheys own the *Tribune*.  (Instead, MNG purchased the *Tribune* in 2001.)  A bitter dispute arose.  Much litigation has ensued, this case being one of three lawsuits filed in this district alone.

## PROCEDURAL BACKGROUND

In this lawsuit KTLLC and MNG seek a declaration "that the Defendants—Philip, Thomas, Sarah, Shaun and Maureen McCarthey—have no individual rights to acquire *The Salt Lake Tribune* separate and apart from the rights that [SLTPC] has under the Option Agreement." (KTLLC/MNG's Mot. Summ. J. at 1.)  KTLLC and MNG contend that the McCartheys have raised every claim already asserted by their company SLTPC in the related cases of <u>Salt Lake Tribune Publishing Company v. AT&T Corporation</u> (Case No. 2:00-CV-936-TC (D. Utah)) (the "<u>AT&T</u> case"), and <u>Salt Lake Tribune Publishing Company v. Management Planning Inc.</u> (Case No. 2:03-CV-565-TC (D. Utah)) (the "<u>MPI</u> case").  KTLLC and MNG assert that the McCartheys may not re-litigate the issues from the other cases, recasting the same claims as individual claims.

The McCartheys, in their counterclaim, assert seven causes of action against KTLLC and MNG: (1) Breach of Express Contract (that is, breach of the "Family Agreement"); (2) Breach of the Covenant of Good Faith and Fair Dealing; (3) Interference with Prospective Economic Advantage; (4) Civil Conspiracy; (5) Aiding and Abetting Interference with Contract;

---

[4]The court does not set forth the facts relating to the Third-Party Defendants because they are not necessary for the court's ruling.

(6) Promissory Estoppel; and (7) Unjust Enrichment (requesting constructive trust and partition).

In their Third-Party Complaint, the McCartheys assert five causes of action against the various Third-Party Defendants: (1) Interference with Contract (that is, interference with the "Family Agreement") (against DNPC and DMC); (2) Interference with Prospective Economic Advantage (against DNPC, DMC, AT&T, Comcast, and Gary Gomm); (3) Civil Conspiracy (against DNPC, DMC, AT&T, Comcast, and Gary Gomm); (4) Aiding and Abetting Interference with Contract (against all Third-Party Defendants); and (5) Unjust Enrichment (against DNPC and DMC).

The dispositive motions before the court seek resolution of all claims asserted by the parties.

## ANALYSIS

**A.    Standards of Review**

### 1.    Summary Judgment Motions

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c);  see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).

### 2.    Rule 12(b)(6) Motions to Dismiss

Rule 12(b)(6) authorizes a court to dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In evaluating a 12(b)(6) motion, a court

must accept all well-pleaded facts as true.  See Ruiz v. McDonnell, 299 F.3d 1173, 1181 (10th

Cir. 2002).  The court must also "view all reasonable inferences in favor of the plaintiff, and the

pleadings must be liberally construed."  Id.

**B.      KTLLC's and MNG's Declaratory Judgment Action and the McCartheys' Contract
         Claims[5]**

         **1.      Does the alleged Family Agreement exist as a collateral agreement?**

         Typically, the issue of whether a contract exists at all is a mixed question of law and fact,

better suited for a jury.[6]  See, e.g., Roach v. Univ. of Utah, 968 F. Supp. 1446, 1455 (D. Utah

1997) (holding that if evidence is conflicting regarding existence of contract, issue is for jury to

decide);  O'Hara v. Hall, 628 P.2d 1289, 1291 (Utah 1981) ("It is the rule 'that where the

existence of a contract is the point in issue and the evidence is conflicting or admits of more than

one inference, it is for the jury to determine whether the contract did in fact exist.'").  But if there

are no conflicting issues of fact, as in this case,[7] the issue is one for the court to resolve.

"Generally, unless there is a material dispute of fact, the existence of a contract is a conclusion of

law."  Reedeker v. Salisbury, 952 P.2d 577, 582 (Utah Ct. App. 1998).

--------

         [5]The McCartheys assert two contract causes of action: breach of express contract and
breach of the implied covenant of good faith and fair dealing.

         [6]The court has diversity jurisdiction.  Accordingly, Utah law applies.  See, e.g., Clark v.
State Farm Mut. Auto. Ins. Co., 433 F.3d 703, 709 (10th Cir. 2005) (stating rule that substantive
law of forum in which court sits applies when the court is exercising diversity jurisdiction).

         [7]The McCartheys insist that they have presented evidence to dispute the facts.  The court
disagrees.  What they present is a set of undisputed facts (some material, some not) and a set of
legal conclusions and personal beliefs that do not create genuine disputes of fact.

a. <u>The contours of the alleged "Family Agreement" have evolved.</u>

What is the alleged Family Agreement?  There is no dispute that the alleged Family

Agreement, assuming it exists, is an oral agreement formed in February 1997.  But beyond that,

the contract concept presented by the McCartheys is nebulous, in part because the alleged oral

agreement has evolved over the last few years.  The evolution is shown in the following history

of the litigation arising out of the 1997 merger and MNG's subsequent purchase of *The Salt Lake*

*Tribune* in January 2001.

On December 1, 2000, SLTPC filed a case against AT&T Corporation, AT&T Broadband

LLC (alleged to be the successor to TCI), MNG, and KTLLC.  SLTPC alleged that:

> TCI had made several different proposals to the KT board for TCI's acquisition of
> KT, and with it the B Stock.  <u>The KT board had consistently rejected these</u>
> <u>proposals because they did not adequately protect the interests of some of the KT</u>
> <u>shareholders to acquire *The Salt Lake Tribune* from TCI</u>. . . .

> TCI finally <u>convinced the KT board</u> to merge KT into TCI.  An April 18, 1997
> Agreement and Plan of Reorganization and Merger (the "Merger Agreement")
> documents this transaction.  This merger closed on July 31, 1997.

> The <u>KT Board</u> would not have approved or entered into the Merger Agreement
> without assurances from TCI officials with whom KT had worked for years, and
> in whom KT officials reposed trust and confidence as a result of that longstanding
> association, that: (1) some <u>former KT owners would be given the option</u> to
> purchase *The Salt Lake Tribune* from TCI after five years; and (2) that pre-merger
> management would continue during the five-year option period to manage *The*
> *Salt Lake Tribune* and other newspapers then owned by KT (collectively the
> "Newspapers") <u>to the same degree that it had managed those operations before the</u>
> <u>merger</u>.

> <u>In furtherance of those objectives, certain pre-merger KT owners and pre-merger</u>
> <u>KT management established SLTPC</u> and, on July 31, 1997, <u>SLTPC</u> entered into
> the Option and Management Agreements with KT, then wholly owned by TCI,

under which <u>SLTPC</u> would manage the Newspapers until the maturity of the
option. . . .

The Option Agreement <u>gives SLTPC</u>, under specified conditions, <u>the right to
purchase</u> on or after July 31, 2002, five years after its execution date, the "Tribune
Assets", which it defined as "all of the assets used, held for use or usable in
connection with the operation and publication of *The Salt Lake Tribune*."

(Fourth Am. Compl. in the <u>AT&T</u> case, Dkt. # 266, ¶¶ 18-21, 23 (emphasis added).)  The

allegations quoted above connect the "pre-merger KT owners and pre-merger KT management"

(the McCartheys in large part) with the KT Board and, more importantly, SLTPC.  The

allegations make no attempt to distinguish between the documents involved in the merger

transaction and the pre-merger negotiations involving the McCartheys.  That is, the deal

described above makes no mention of a separate oral agreement.

The concept of the alleged Family Agreement was first introduced in litigation papers

almost a year later, on November 20, 2001, when the McCartheys filed a complaint in Colorado

state court against KTLLC, MNG, AT&T Broadband LLC, AT&T Corporation, and DNPC.

(<u>See</u> Ex. A to Dkt. # 335 in the <u>AT&T</u> case (the "Colorado Complaint").)[8]  In the Colorado

Complaint, the McCartheys sought to recover ownership of the *Tribune* through enforcement of

what they called "the 1997 overall agreement."  (<u>Id.</u> ¶¶ 1, 3.)  They alleged that "TCI acquired the

*Salt Lake Tribune* <u>from the Plaintiffs</u> pursuant to an agreement in 1997."  (<u>Id.</u> ¶ 3 (emphasis

added).)  The McCartheys described the so-called "1997 overall agreement" in the Colorado

---

[8]The Colorado case is styled <u>Philip G. McCarthey, Thomas K. McCarthey, Sarah J.
McCarthey, Shaun P. McCarthey and Maureen P. McCarthey v. MediaNews Group, Inc.; AT&T
Broadband, LLC; AT&T Corporation; Kearns-Tribune LLC; and Deseret News Publishing
Company</u>, and was filed on November 20, 2001 in the District Court, City and County of Denver,
State of Colorado.

Complaint as follows:

> In or about April, 1997, the 1997 overall agreement, which consists of a set of interconnected agreements and understandings, was reached among TCI, Kearns Tribune Corporation and the Plaintiffs for a merger between TCI and Kearns Tribune Corporation that would allow an affiliate of TCI to purchase the subject stock, exchange Kearns-Tribune shares for TCI shares, preserve the Tribune as an independent non-sectarian voice, and permit the Plaintiffs through the Salt Lake Tribune Publishing Company, to manage the Tribune and to acquire the Tribune in the future if they determined to do so.  The 1997 overall agreement consisted of numerous contracts, representations, agreements, courses of conduct and dealing, and undertakings, oral and written, by, between, and among Plaintiffs, the entities they controlled, TCI, and long time trusted TCI senior management and other TCI representatives.

(Colorado Compl. ¶ 29 (emphasis added).)  The Colorado Complaint did not mention, much less focus on, a designated methodology to set an option exercise price (which, as discussed below, became a focal point of the alleged collateral agreement).  (See id.)  The Colorado court stayed the case pending resolution of the AT&T case in Utah.  But the McCartheys' allegations in Colorado about an overall agreement apparently prompted KTLLC and MNG to file the current declaratory judgment action on February 14, 2003.

On June 11, 2003, the appraisal firm of Management Planning, Inc. (MPI) issued its final appraisal report that resulted in setting the option exercise price at $355 million ($155 million more than MNG had paid two years earlier).  On June 24, 2003, SLTPC sued MPI in this district (see Salt Lake Tribune Publishing Company v. Management Planning Inc. (Case No. 2:03-CV-565-TC (D. Utah)) (the "MPI case")) and challenged the allegedly flawed appraisal of MPI.  SLTPC alleged that the MPI Appraisal was used to set an allegedly grossly inflated purchase price of the *Tribune* assets under the 1997 Option Agreement.

> It was the <u>intent of the framers</u> of the Option Agreement that <u>the methodology</u> for determining the Fair Market Value of the Tribune Assets pursuant to the Option Agreement would be the standard industry approach to determining fair market value, an approach that presumes an open and efficient market for the contemplated transaction, and which was <u>the approach used by Houlihan, Lokey, Howard & Zukin to value the Tribune Assets at the time of the negotiation of the Option Agreement.</u>  <u>This intent is reflected in the Option Agreement's definition of the term Fair Market Value</u>: "The term 'Fair Market Value', when used with reference to the Tribune Assets, shall mean the price at which a willing seller would sell, and a willing buyer (having full knowledge of the facts) would buy, the Tribune Assets in an arms' length transaction without time constraints and without being under any compulsion to buy or sell."

(SLTPC's First Am. Compl. in <u>MPI</u> case at ¶ 24 (emphasis added).)  On October 2, 2003, the court denied SLTPC's motion to vacate the appraisal.  (See Oct. 2, 2003 Order Denying Pl.'s Mot. To Vacate, Dkt # 63 in the <u>MPI</u> case.)  The Tenth Circuit reversed and remanded that decision on November 30, 2004.  <u>Salt Lake Tribune Publ'g Co., LLC v. Management Planning, Inc.</u>, 390 F.3d 684 (10th Cir. 2004).  But then on October 24, 2005, the court dismissed SLTPC's complaint for various reasons, leaving the option exercise price intact.  (See Oct. 24, 2005 Order & Mem. Decision, Dkt. # 138 issued in the <u>MPI</u> case.)

After the court in the <u>MPI</u> case denied SLTPC's request to vacate the appraisal (and before the Tenth Circuit reversal of that decision), the McCartheys filed their November 9, 2004 Counterclaim and Third-Party Complaint in this case.  They again raised the spectre of "the 1997 overall agreement," this time calling it the "Family Agreement."  Now the McCartheys allege that the terms and conditions of the Family Agreement are as follows:

> Specifically, the terms and conditions agreed to by KT [Kearns-Tribune Corporation] and TCI and forming the consideration for the McCartheys' approval of the KT-TCI merger and conveyance of their KT shares to TCI include the following:
>
> a. the assets of the *Tribune* would not be materially changed during the period it was owned by a third-party. . . .

      b.    <u>a new entity, yet to be created</u>, would have the right to manage the *Tribune* during the time it was owned by a third party. . . .

      c.    <u>a new entity, yet to be created</u> by certain shareholders of KT, <u>would have the right to reacquire</u> the *Tribune* at the end of the period imposed by tax considerations. . . .

      d.    the price for reacquisition of the *Tribune* at the end of the period imposed by tax considerations would be a <u>standard practice fair market price</u>. It was understood by all parties that the price would be <u>calculated through the same method the professionals [Houlihan Lokey] used to value the *Tribune* in 1997 in connection with the KT-TCI Merger</u>. . . .

(McCartheys' Counterclaim ¶ 54 (emphasis added).)[9] They further allege that their claims "are <u>separate and distinct</u> from those brought by SLTPC [in the <u>AT&T</u> case] to enforce its option to purchase the *Tribune*. <u>The McCartheys' claims are based on their individual rights</u>, including contractual, legal and equitable rights, which are <u>independent of the rights of SLTPC</u>." (<u>Id.</u> at p. 9 n.1 (emphasis added).) The McCartheys essentially allege that there are two parallel contracts allowing different parties to purchase the same assets at different prices on the same date. (<u>See also</u> Transcript of Mar. 8, 2006 Hearing [hereinafter "Tr."] at 44 ("Our [the McCartheys'] agreement [is] parallel" to the merger documents, including the Option Agreement).)

---

    [9]In connection with the merger, the KTCorp Board "retained the firm of Houlihan Lokey to review the fairness, from a financial point of view, of the Merger and the transactions contemplated by the Management Agreement and the Option Agreement, to KT, and the fairness, from a financial point of view, of the consideration to be received by the shareholders of KT." (Proxy Statement at 5 (attached as Ex. 32 to KTLLC/MNG's Mot. Summ. J.).) The Houlihan Lokey opinion, referred to as the "Fairness Opinion," is attached to the July 2, 1997 Proxy Statement as Appendix II. (<u>See also</u> April 1997 Merger Agreement at §§ 4.13, 7.1(e) (referencing Houlihan Lokey Fairness Opinion).) It is troubling that it appears that the methodology used by Houlihan Lokey to value the *Tribune* in connection with the merger was not actually known or articulated at the point the Family Agreement was allegedly formed in February 1997 (before the merger was approved), and yet it is part of the alleged agreement's covenant regarding the reacquisition price.

In the McCartheys' brief opposing KTLLC's and MNG's Motion for Summary Judgment, they further elaborate that the merger documents were "mechanisms" to carry out the Family Agreement:

> The Family Agreement is, in fact, the contract under which the McCartheys, through the mechanism of a merger, conveyed their KT shares to TCI. In consideration for the McCartheys' KT shares, TCI issued to the McCartheys shares of TCI stock and made four covenants to be performed after closing. The four covenants are:
>
> I. The assets of the *Tribune* would not be materially changed during the period they were owned by a third-party;
>
> ii. A new entity to be created by some of the shareholders of KT would have the right to manage the *Tribune* during the time it was owned by a third party;
>
> iii. A new entity, yet to be created by some of the shareholders of KT, would have the right to reacquire the *Tribune* at the end of the period imposed by tax considerations; and
>
> iv. The price for reacquisition of the *Tribune* would be a standard practice fair market value employing the same methodologies used to value the *Tribune* at the beginning of the merger.

(McCartheys' Opp'n at p. xxvii ¶ 36 and p. 2 (emphasis added).)

During the hearing, the court asked the McCartheys' counsel to answer the questions "What is the Family Agreement?" and "How does it differ from the written agreements?". The McCartheys' counsel asserted that the alleged Family Agreement is a collateral agreement. (Tr. at 44.) He reiterated the covenants stated in the pleadings. And he maintained that the Option Agreement and the Management Agreement were "mechanisms" that failed to carry out the assurances contained in the Family Agreement. (See id. at 34-35, 40-41, 48-49, 52-55.) That is, the "agreement was [that] if these [mechanisms] don't work, we will make it happen [some other way]." (Id. at 41; see also id. at 49, 51-56, 58.) "We just assert and allege [that] the Option and

14

Management Agreements <u>as to us</u> [the McCarthey siblings] have failed." (<u>Id.</u> at 49 (emphasis added).)

> b.    <u>There is no evidence of a separate "Family Agreement."</u>

>> I.    Written Documentation

The McCartheys contend that the Family Agreement is a collateral contract with terms that "do not remotely contradict the written agreements. Rather [the terms] merely supplement and complement those [written] agreements." (McCartheys' Opp'n at 23.) The McCartheys point to alleged consideration on their part and four covenants that make up the Family Agreement. But the record shows that the consideration and all four covenants were reduced to signed writings in the form of the Management and Option Agreements (to which SLTPC is a party), and the Voting Agreement (to which the McCarthey Family Trust is a party).[10] And other documentation, such as the Proxy Statement and the Merger Agreement, supports the conclusion that no separate oral agreement existed.

### (a)    The Voting Agreement

The McCartheys contend that, as consideration for the alleged oral agreement, they—despite their earlier opposition to the merger—"committed [their] 40% legal and beneficial interest in KT stock to the deal." (McCartheys' Opp'n at x.) The shares (the "40% legal and beneficial interest in KT stock") that gave the McCartheys a de facto controlling

---

[10]"Family Trust" refers to the McCartheys' Qualified Terminable Interest Property ("QTIP") Trust, formed on January 3, 1990, for the benefit of Jane McCarthey and her children Thomas, Philip, Sarah, Shaun, and Maureen McCarthey.

interest in KTCorp were not held by them individually, but by the McCarthey Family Trust.[11] And the Family Trust was the signatory to the April 18, 1997 Voting Agreement, in which the signatories agreed to approve the merger and convey the shares "in consideration of the premises, covenants and representations contained herein and in the Merger Agreement, and other good and valuable consideration . . . ." (Voting Agreement at p. 1 (attached as Ex. 31 to KTLLC/MNG's Mot. Summ. J.).) Indeed, the McCarthey siblings successfully urged their mother, the trustee, to sign the Voting Agreement specifically because they had brokered a deal regarding the merger, and subsequent management of and option to purchase the *Tribune*.

In the written Voting Agreement, the Family Trust made the legal commitment to approve the merger and convey the shares. The plain language of the Voting Agreement states that its signatories—including the McCarthey Family Trust—agreed to vote their shares "in favor of the adoption of the Merger Agreement and approval of the Merger and the other transactions contemplated by the Merger Agreement." (Id. ¶ 1.01.) Moreover, the Family Trust "covenant[ed] and agree[d]" that it had not and would "not enter into any voting agreement . . . with respect to its Shares which is inconsistent with this Agreement." (Id. ¶ 3.01.)

The McCartheys emphasize that if they (as individuals) had not agreed to approve the merger and convey their shares, the merger would not have occurred. (See also Proxy Statement at 2 ("The vote of such KT shareholders in accordance with the Voting Agreement would be sufficient to approve the Merger Agreement without any action on the part of any other holder of KT Common Stock.").) Yet, at the same time, they unconvincingly attempt to distance

---

[11]Of that 40% interest in KTCorp stock, the Family Trust held about 36% of the shares and the McCarthey siblings as a group held about 4%.

themselves from the Voting Agreement by noting that they, as individuals, were not signatories

to the written contract.  Even though the individual McCartheys technically were not parties to

the Voting Agreement, they certainly were closely affiliated with one of the signatories and admit

that they had control over the individual who signed the Voting Agreement.[12]  The marked

similarity of the content and subject matter of the Voting Agreement to the content and subject

matter of one of the alleged oral covenants of the Family Agreement—as well as the

McCartheys' close association with the signatory to the Voting Agreement—is persuasive

evidence that no separate oral agreement existed.  See also, _infra_, discussion of integration

clauses.

### (b)      The Management and Option Agreements

#### (1)      _Comparison of the Covenants_

As discussed, the McCartheys claim that the Family Agreement has four covenants.  But

these same four covenants are found in either the Management Agreement or the Option

Agreement.  This is further evidence that no separate Family Agreement exists.

The McCartheys allege that the first covenant of the Family Agreement required that "the

assets of the _Tribune_ would not be materially changed during the period it was owned by a third-

party."  (Counterclaim ¶ 54(a).)  But that covenant is contained in the Option Agreement.  The

Option Agreement restricts sale or transfer of the Tribune Assets during the five-year period of

---

[12]Indeed, during the hearing, the McCartheys' counsel stated that the distinction between
the Family Trust and the individual shareholders was not material in this case.  "We don't think it
matters for two reasons. [First, three individuals that are parties to this litigation – Philip, Sarah
and Thomas McCarthey] were K.T. Board members. . . . [Second,] all five siblings were
beneficial owners of the Kearns-Tribune Corporation stock."  (Tr. at 27-28.)

the Management Agreement and grants to SLTPC the option to purchase "all, and not less than all" of the Tribune Assets at the end of the five-year period.  (Option Agreement ¶¶ 1, 6.)

The McCartheys allege that the second covenant of the Family Agreement required that "a new entity, yet to be created, would have the right to manage the *Tribune* during the time it was owned by a third party."  (Counterclaim ¶ 54(b).)  This requirement was embodied in the Management Agreement.  The Management Agreement appointed SLTPC, the entity created by the McCartheys and some of their fellow KTCorp shareholders at the time of the merger, to "manage the publication and operation" of the *Tribune* for the five-year period before SLTPC could first attempt to exercise the option to buy the newspaper.  (Management Agreement §§ 2.01, 3.01.)

The McCartheys allege that the third covenant of the Family Agreement required that "a new entity, yet to be created by certain shareholders of KT, would have the right to reacquire the *Tribune* at the end of the period imposed by tax considerations [that is, the five-year option period]."  (Counterclaim ¶ 54(c).)  As noted above, the Option Agreement gives SLTPC, the "new entity," an option "to purchase all, and not less than all" of the Tribune Assets five years after the merger between KTCorp and TCI.  (Option Agreement ¶¶ 1, 3.)

And, finally, the McCartheys allege that the fourth covenant of the Family Agreement required that "the price for reacquisition of the *Tribune* at the end of the period imposed by tax considerations would be a standard practice fair market price.  It was understood by all parties that the price would be calculated through the same method the professionals [Houlihan Lokey] used to value the *Tribune* in 1997 in connection with the KT-TCI Merger."  (Counterclaim

18

¶ 54(d).)  In comparison, the Option Agreement provides that the exercise price for SLTPC's

acquisition of the Tribune Assets shall be "Fair Market Value," defined as "the price at which a

willing seller would sell, and a willing buyer (having full knowledge of the facts) would buy, the

Tribune Assets in an arms' length auction transaction without time constraints and without being

under any compulsion to buy or sell."  (Option Agreement ¶ 2(a).)   The Option Agreement also

sets forth a somewhat involved process to follow (something to the effect of a comparison and

averaging of multiple appraisals) if the parties cannot agree on an exercise price.  (See id.

¶ 2(b).)[13]

### (2)   *Parol Evidence Rule and Integration Clauses*

### (a)   Conflicting Evidence

To the extent that the methodology vaguely described in the Family Agreement conflicts

with the methodology and process set forth in the Option Agreement, a potential parol evidence

rule issue arises.  KTLLC/MNG contend that the parol evidence rule precludes the McCartheys

from establishing an oral agreement that contradicts the written agreements.

> The parol evidence rule, as applied to integrated contracts, is a substantive rule of
> contract construction, rather than a rule of evidence.  Parol evidence is not so
> much <u>inadmissible</u> to vary the terms of an integrated writing as it is <u>irrelevant</u>,
> because "the later agreement <u>discharges</u> the antecedent ones in so far as it
> <u>contradicts or is inconsistent with</u> the earlier ones."

---

[13]Interestingly, the Proxy Statement presented to KTCorp shareholders a proposed Option Agreement that contained the <u>exact</u> same language ultimately approved in the final Option Agreement. (<u>Compare</u> Proxy Statement Ex. 7.3(j)-2 § 2(a) <u>with</u> Option Agreement § 2(a).)  This is what was disclosed to shareholders.  This is what shareholders approved when they voted for the merger.  And, not so incidentally, the majority shareholders (whose vote alone was all that was needed to approve the merger) were the McCarthey family as legal and beneficial owners of 40% of the KTCorp stock.

Novell, Inc. v. Canopy Group, Inc., 92 P.3d 768, 772 (Utah Ct. App. 2004) (emphasis in original; internal citation omitted).  "The parol evidence rule 'operates in the absence of fraud to exclude [prior and] contemporaneous conversations, statements, or representations offered for the purpose of varying or adding to the terms of an integrated contract.'"  Id. at 772 (quoting Union Bank v. Swenson, 707 P.2d 663, 665 (Utah 1985) (emphasis omitted)).

To apply the parol evidence rule, the court must first determine whether the writing was intended by the parties to be integrated.  Utah courts apply a "rebuttable presumption that a writing which on its face appears to be an integrated agreement is what it appears to be."  Union Bank, 707 P.2d at 665.  See also Terry's Sales, Inc. v. Vander Veur II, 618 P.2d 29, 32 (Utah 1980) ("Where parties have various claims and obligations to each other, and have had a discussion about resolving their disputes which results in a written agreement signed by them, it is generally to be assumed that their disputes were merged into the written agreement.").  The Option Agreement contains an integration clause.  (See Option Agreement ¶ 10.)  Although the McCartheys argue that the integration clause does not apply to them because they are not signatories to the contract, they do not rebut the presumption that the contract is integrated.  They simply state that such a finding is a factual dispute better left to the jury.  (See McCartheys' Opp'n at 17-18.)  But that is not necessarily so.  "If the 'contract terms are complete, clear, and unambiguous[, they can] be interpreted by the judge on a motion for summary judgment.'"  Smith v. Osguthorpe, 58 P.3d 854, 858 (Utah Ct. App. 2002) (quoting Webb v. R.O.A. Gen., Inc., 804 P.2d 547, 551 (Utah Ct. App. 1991)).  The court finds that the Option Agreement is an

integrated contract.[14]

The McCartheys contend that the parol evidence rule is not implicated here because the written agreements are not the focus (at least directly) of the McCartheys' claim.  See Garrett v. Ellison, 72 P.2d 449, 451 (Utah 1937) (noting that parol evidence rule is applicable in action founded upon a written instrument that the party seeks to vary, alter, or contradict).  Indeed, the McCartheys attempt to distance themselves from the written agreements and establish a collateral agreement.  It is true that the parol evidence rule "does not preclude proof of agreements as to collateral matters relating to the contract or its performance," but that proposition is only true as long as the collateral matters "are not inconsistent with nor in repudiation of the terms of the written agreement."  FMA Fin. Corp. v. Hansen Dairy, Inc., 617 P.2d 327, 329 (Utah 1980); see also, e.g., Dayvault v. Baruch Oil Corp., 231 F.2d 413, 414 (10th Cir. 1956) (noting the "well known policy rule against the introduction of oral testimony to impeach a written contract").  And it is no answer in this particular case to say that the parol evidence rule may not be applied to third-parties (that is, not signatories of the contract).  See Continental Ill. Nat'l Bank & Trust Co. of Chicago v. FDIC, 799 F.2d 622, 626 (10th Cir. 1986) (noting that parol evidence rule applies to "parties to the agreement and their privies" and applying rule to third-party who was so "closely affiliated" to the contract signer that it was not a stranger to the contract for purposes of the parol evidence rule);  United States v. Vahlco Corp., 720 F.2d 885, 892 (5th Cir. 1983)

---

[14]Even if the agreement is not completely integrated, the McCartheys should not be allowed to present evidence of a valuation methodology different from the one set forth in the Option Agreement.  "Where a written contract is obviously not, or is shown not to be, a complete contract, parol evidence not inconsistent with the writing is admissible to show what the entire contract really was, by supplementing, as distinguished from contradicting the writing." Stanger v. Sentinel Sec. Life Ins. Co., 669 P.2d 1201, 1205 (Utah 1983) (emphasis added).

(applying parol evidence rule to third-party who was "so closely affiliated [with the signing party

that] it may not be deemed a 'stranger' to the contract.").  To the extent that the oral covenants

conflict with the content of the signed writings, the McCartheys' attempt to prove an oral

collateral agreement that contradicts a written agreement is at odds with the purpose, if not the

letter, of the parol evidence rule.

> The [parol evidence] rule is founded upon the principle that when the parties have
> discussed and agreed upon their obligations to each other, and reduced those terms
> to writing, that such terms, if clear and unambiguous, furnish better and more
> definite evidence of what was undertaken by each party than the too often fickle
> memory of man, for why else reduce it to writing.

Garrett, 72 P.2d at 451-52.

The McCartheys' claim of a collateral Family Agreement essentially is a collateral attack

on the written agreements entered into in connection with the merger, in particular the Option

Agreement.  The McCartheys themselves describe the Option Agreement as a failed mechanism.

They specifically argue that the Option Agreement's appraisal process "is at variance with the

process that was promised to the McCartheys in the Family Agreement."  (McCartheys' Opp'n at

xvi-xvii.)[15]  The McCartheys essentially seek what amounts to a wholesale re-writing of the

Option Agreement's definition of "Fair Market Value" and an avoidance of the Option

Agreement's process for settling differences regarding the exercise price.  Ironically, the

McCartheys quote FMA Fin. Corp., 617 P.2d at 329, which states that the parol evidence rule

should not be applied with "unreasoning rigidity as to defeat what may be shown to be the actual

---

[15]This statement is made despite the McCartheys' contention in the very same brief that
the Family Agreement is a collateral contract and that its terms "do not remotely contradict the
written agreements."(McCartheys' Opp'n at 23.)

purposes and intent of the parties, but should be applied in the light of reason to serve the ends of justice."  The complement to this statement is that the parol evidence rule should not be avoided with "unreasoning rigidity" to defeat the rule's purpose of preserving the integrity of written contracts.

From a purely equitable point of view, allowing the McCartheys, who clearly were not strangers to the transaction, to re-create the Option Agreement with terms arguably more favorable to them (and SLTPC) would be untenable.  From an evidentiary point of view, the alleged fourth covenant of the Family Agreement, even to the extent that it contradicts the Option Agreement, does not support the conclusion that an oral agreement regarding option exercise price exists apart from the Option Agreement.

(b)     Integration Clauses

The Voting Agreement, the Management Agreement, and the Option Agreement all contain integration clauses.  (See Voting Agreement § 4.03 ("This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof."); Management Agreement § 8.05 ("This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, superseding all prior agreements or undertakings oral or written"); Option Agreement § 10 (same).)  Integration clauses such as these are routinely enforced to prevent a party from claiming that an agreement outside the contract changes, supersedes or adds to the terms of the written contract itself.  See, e.g., Brown v. Richards, 840 P.2d 143, 148 (Utah Ct. App. 1992) ("'[A]

23

party may not establish a different contract on facts known at the time of reducing their understanding to written form.  All preliminary negotiations, conversations, and verbal agreements are merged in and superseded by the subsequent written contract . . . .'") (quoting Lamb v. Bangart, 525 P.2d 602, 607 (Utah 1974)).  These integration clauses preclude the McCartheys' claims as a matter of law.

The McCartheys contend that they are not parties to those agreements and so are not bound by the integration clauses.[16]  Given the law and the unique facts of this case, the court disagrees.

The McCartheys are so closely affiliated with the signatories to the contracts (the McCarthey Family Trust and SLTPC) that they should be considered privies to the signatories and so bound by the integration clauses.  See, e.g., Continental Illinois Nat'l Bank & Trust Co. of Chicago v. FDIC, 799 F.2d 622, 626 (10th Cir. 1986) (applying Oklahoma law, the court noted that the parol evidence rule "clearly applies to parties to the agreement and their privies" and found that a third-party to the contract was "so closely affiliated . . . [that it] cannot be deemed a stranger to the contract for purposes of the application of the parol evidence rule.  It is clearly a beneficiary of the note and its predecessor in interest was a party to the contract."); Garrett v.

---

[16]The McCartheys present the Affidavit of Cathy S. Krendl to support their argument. But Ms. Krendl offers legal opinions which are not admissible.  It is well established that "an expert may not state legal conclusions drawn by applying the law to the facts." Evans v. Ind. Sch. Dist. No. 25, 936 F.2d 472, 476 (10th Cir. 1991); see also Specht v. Jensen, 853 F.2d 805, 809 (10th Cir. 1988) (holding that questions of law are not the subject of admissible expert testimony); Utah Med. Prods., Inc. v. Clinical Innovations Assocs., Inc., 79 F. Supp. 2d 1290, 1316-17 (D. Utah 1999) (holding that legal opinions attempting to define legal parameters should be left to court and jury).  Accordingly, the court disregards the legal opinion evidence of Ms. Krendl.

Ellison, 72 P.2d 449, 451 (Utah 1937) ("Parol evidence is inadmissible to vary, alter, control, or contradict the terms of a written instrument, in an action founded upon such writing, between the parties or privies thereto.") (emphasis added).

Even though the McCartheys as individuals were not parties to the written agreements, they were not strangers to the merger-related written documents.  Their beneficial interest in KTCorp was the subject of the Voting Agreement, which they urged their mother, the Trustee, to sign.  Three of the five siblings were directors and officers of KTCorp, a party to the Management and Option Agreements.  The entity they formed, SLTPC, was the "new entity" referred to in the alleged Family Agreement and a party to the Management and Option Agreements.  And there is no dispute that the subject matter addressed by the written agreements was the same as the subject matter addressed by the alleged Family Agreement.

The court interprets the cases regarding "closely affiliated" parties to compel application of the integration clauses in this case.  But even if the McCartheys by law are not bound by the written integration clauses, the clauses are simply more evidence that the parties involved in the negotiations (including the McCartheys) intended to (and did) reduce the pre-merger discussions to writing.

### (c)      The Proxy Statement

The Proxy Statement issued by the KTCorp Board (including then-directors Thomas, Sarah, and Philip McCarthey) enumerated every "interest[] in the Merger" of "members of KT's management and the KT Board" that was "in addition to or different from the shareholders of KT generally."  (Proxy Statement at 4 (attached as Ex. 32 to KTLLC/MNG's Mot. Summ. J.).)  If the

McCartheys, as directors of the KTCorp Board, had an oral agreement with TCI under which they agreed to approve the merger in exchange for promises regarding the future management and ownership of the *Tribune*, such agreement would have had to have been disclosed in the Proxy Statement by KTCorp in order to secure shareholder ratification of an otherwise self-dealing transaction.

The provision in the Merger Agreement allowing SLTPC the right to manage, and an option to buy, a particular KTCorp asset was the epitome of a conflicting interest transaction. That is, the companies, in connection with the merger, granted to a subset of shareholders (who were directors and officers) the de facto right to manage and eventually acquire the *Tribune*. In order to ensure that a conflicting interest transaction will not be void for self-dealing, the Utah Revised Business Corporation Act requires that the transaction be approved, after full disclosure, by a vote of either the disinterested members of the board or a majority of the shareholders.

> Shareholders' action respecting a transaction is effective for purposes of Subsection 16-10a-851(2)(b) if a quorum existed pursuant to Subsection (2) and a majority of the votes . . . were cast in favor of the transaction after notice to shareholders describing the director's conflicting interest transaction . . . .

Utah Code Ann. § 16-10a-853 (2005). The KTCorp Board and eventually the shareholders had to approve the terms of the merger with TCI. Indeed, the Proxy Statement was furnished by KTCorp to all "holders of Common Shares" of KTCorp "in connection with the solicitation of proxies by the Board of Directors of KT" (which included Thomas, Sarah, and Philip McCarthey) for a shareholder meeting to vote on the proposed merger. (Proxy Statement at i.)

But no separate oral agreement is disclosed in the Proxy Statement, the most obvious

vehicle for disclosure.  Instead, the Proxy Statement describes the entire transaction as

interconnected with the written Voting, Option, Management, and Merger Agreements and

makes no reference to a "Family Agreement."  For instance, the July 2, 1997 Proxy Statement

reads:

> <u>In connection with the Merger</u>, certain directors, officers, and shareholders of KT <u>formed a management company</u> that <u>will enter into a management agreement (the "Management Agreement")</u> with KT to manage the newspaper businesses of KT after the Merger.  The management company <u>will also enter into an option agreement (the "Option Agreement")</u> whereby KT will grant to the management company the right to purchase all the assets used by KT in connection with the operation of *The Salt Lake Tribune* after five years at fair market value.  See "CERTAIN TRANSACTIONS BETWEEN TCI AND KT AND WITH THEIR STOCKHOLDERS."

(Proxy Statement at ii (emphasis added).)  In a section of the Proxy Statement called "Interests of

Certain Persons in the Merger," the interests of the McCartheys appear to be interchangeable

with the interests of SLTPC in the Management Agreement and the Option Agreement.

> **Interests of Certain Persons in the Merger**
>
> In considering the recommendations of the KT Board with respect to the Merger, shareholders should be aware that <u>some of the members of KT's management and the KT Board have certain interests in the Merger that are in addition to or different from the interests of shareholders of KT generally</u>.  See "THE MERGER—Interests of Certain Persons in the Merger."  The KT Board was aware of these interests and considered them, among other matters, in approving the Merger Agreement.  Certain shareholders of KT and certain members of KT's management <u>have formed The Salt Lake Tribune Publishing Company, LLC</u>, a Utah limited liability company ("SLT").  As a <u>condition</u> to the Merger, <u>KT and SLT will enter into the Management Agreement</u>, pursuant to which KT will engage SLT to supervise and manage the publication and operation of the newspaper businesses owned by KT (the "Newspapers") and to render services related thereto. . . . Also as a <u>condition</u> to the Merger, <u>KT and SLT will enter into the Option Agreement</u>, pursuant to which KT will grant SLT an option (the "Tribune Option") to purchase all of the assets used in connection with the operation and publication of *The Salt Lake Tribune* (such assets, the "Tribune

Assets").  <u>The exercise price of the Tribune Option (the "Exercise Price") will be equal to the Fair Market Value (as defined in the Option Agreement) of the Tribune Assets</u>.

(<u>Id.</u> at 4 (emphasis added).)  And the Proxy Statement specifically states that KTCorp is not a party to any other contract or understanding related to the merger.

> <u>Other than the Merger Agreement and the related transactions described in this Proxy Statement/Prospectus</u>, there has not been during the last two full fiscal years of KT any material contract, arrangement, understanding, relationship, negotiation or transaction between KT or its affiliates and TCI or its affiliates concerning a merger, consolidation or acquisition, tender offer or other acquisition of securities, election of directors, or a sale or transfer of a material amount of assets.

(<u>Id.</u> at 25 (emphasis added).  The Proxy Statement is evidence that the entire transaction and the interests of the McCartheys were inextricably tied up with the Merger Agreement and "the related transactions described in [the] Proxy Statement/Prospectus" (that is, the Voting Agreement, the Management Agreement, and the Option Agreement).  Consequently,  there was no collateral Family Agreement.

### (d)    The Merger Agreement

The Merger Agreement is also evidence that there was no separate Family Agreement.  KTCorp and the McCartheys (who were KTCorp directors, officers, and/or shareholders) are alleged to be parties to the February 1997 Family Agreement.  KTCorp was also a party to the April 18, 1997 Merger Agreement.  KTCorp represents in the Merger Agreement that, "[e]xcept as set forth in Schedule 4.20, there is no . . . contract, agreement, commitment, understanding, or other arrangement of any kind entered into by [KTCorp] with respect to [KTCorp] with any officer, director, or shareholder of [KTCorp] . . . except . . . for management fees and other

28

compensation paid to officers . . . ."  (Merger Agreement § 4.20 (attached as Ex. 35 to

KTLLC/MNG Mot. Summ. J.).)  And there is no reference in Schedule 4.20 of the Merger

Agreement to a "Family Agreement" or any kind of oral collateral agreement between the

McCarthey siblings and KTCorp.  (See id. Schedule 4.20.)  The language of the written

agreement is incongruous with a finding that a separate oral agreement between KTCorp and the

McCartheys existed before the Merger Agreement was executed.

ii.    Testimony

The McCartheys also cite to deposition testimony, affidavits, and declarations to show

that a separate oral Family Agreement exists.  In particular, in addition to their own testimony,

they rely on the testimony of John "Jack" Gallivan, John Malone, and Dominic Welch.  But the

cited testimony does not support their claim.  In fact, the record testimony is further evidence that

the written agreements were the only agreements.

The McCartheys acknowledge that there were only two negotiators of the alleged Family

Agreement: Mr. Gallivan and Mr. Malone.  The McCartheys never spoke to Mr. Malone.  Rather,

they relied solely on Mr. Gallivan, who communicated assurances to the McCartheys based on

his discussions with Mr. Malone.  The two negotiators, both of whom were in a position to know,

testify that there was no separate oral agreement.  Mr. Gallivan's testimony shows that he made

assurances to the McCartheys, based on conversations and negotiations with Mr. Malone, as to

his view of the "ironclad" nature of the written Option and Management Agreements and his

certitude that TCI would faithfully perform under those written merger-related agreements.

John Malone, a central negotiator, emphasizes in his first declaration that the Option and

29

Management Agreements each "contained integration clauses providing it was the entire agreement between the parties superseding all prior agreements and undertakings, written or oral." (Malone Feb. 1, 2001 Decl. ¶ 6 (attached as Ex. 30 to KTLLC/MNG's Mot. Summ. J.).) In another declaration, Mr. Malone states that his negotiations with Mr. Gallivan resulted in "mutual understandings for the Merger," but that "[t]he lawyers were then directed to <u>prepare the Merger documents necessary to reflect our mutual understandings</u>." (Malone July 6, 2005 Decl. ¶ 11 (emphasis added).) Similarly, he states that the "<u>essential terms</u> of the Merger . . . <u>were to be incorporated into the Merger documents by the attorneys</u>." (<u>Id.</u> ¶ 12 (emphasis added).) He further notes that, at the time of the 1997 negotiations, Mr. Gallivan could rely upon "TCI's historical business practices and ethics that TCI would <u>perform the Merger documents</u> fairly and in a good manner." (<u>Id.</u> ¶ 15 (emphasis added).)

During the hearing, counsel for the McCartheys emphasized deposition testimony of Mr. Malone, arguing that it is further evidence of a collateral oral agreement. For example, when Mr. Malone objected during an AT&T Board Meeting to AT&T's proposed sale of the *Tribune* to MNG, he characterized his filibuster as

> a statement by me that the proposed transaction was inconsistent with the overall understanding between the parties, and I believed this was a terrible way to treat a set of investors who had been with the precedent company for so many years, to <u>breach the intent</u>, as I understood, the intent of the original agreement.

(Malone Oct. 22, 2001 Dep. at 57 (attached as Ex. 20 to McCartheys' Opp'n Mem.)(emphasis added).) He further explained that

> the original intent of the parties was that the Kearns-Tribune – a subset of the original shareholders of the Kearns-Tribune Corporation had formed a

management agreement, management company to operate the business; that over a period of years they would operate it under reasonable investment supervision by TCI; that at the end of that time frame they would be afforded the opportunity to reacquire the newspaper business.  <u>And while the lawyers may have found some way to get around the intent of the original agreement, that it was poor policy for AT&T to seek ways around the intent of the agreement</u>, and that was the filibuster.

(<u>Id.</u> at 57-58 (emphasis added).)  In a later deposition, Mr. Malone testified that he understood the phrase "integration clause" but he also understood that with "people who have been doing business together for many years, there – you go <u>beyond the written agreement</u> and say, We're going to do everything we can to make sure that the <u>intent</u> between the parties is carried out." (Malone Apr. 2, 2002 Dep. at 52-53 (attached as Ex. 18 to KTLLC/MNG's Mot. Summ. J.)(emphasis added).)  During that same deposition, the following exchange occurred:

> Q.    Well, let me ask this question: Are there terms of this deal, legally binding terms of this deal between TCI and Kearns-Tribune, that were not submitted to the tax lawyers prior to their issuing an opinion that this was a tax-free transaction? . . .
>
> [A.]    I go back to the fundamental concept, that – that <u>we defined the intent in broad terms, and it was up to the attorneys to document that intent; and if they, for one reason or another, left holes that didn't properly describe the intent, it's a shame</u>.
>
>    It creates a mismatch between the intent of the parties and <u>the documents</u>.  In that context, all I can say is, you know, we – somebody should have pointed that out along the way, and we would have fixed it.
>
>    Or we wouldn't have done the deal.  I mean, if, in fact . . . the owners of the Kearns-Tribune relied upon a relationship that they had with TCI over many years to honor the intent of the agreement <u>irregardless of how the documents turned out</u>, they could have relied on that, had we [TCI] been in control . . . .

(<u>Id.</u> at 58-59 (emphasis added).)  When asked whether there was nothing that could be done about a failure to express the complete agreement in writing, Mr. Malone responded:

31

> The way the businessman looks at it is that <u>if the lawyers have screwed up the deal and not accurately executed in the documents the intent of the parties</u>, you go back and fix it.  You revisit it.  You treat each other like legitimate, long-term business participants, and you – you go back to the original intent.  <u>That's a business concept.</u>  Whether or not courts subscribe to that way of dealing between parties, I don't know.

(<u>Id.</u> at 103-04 (emphasis added).[17]  Mr. Malone's testimony actually validates the proposition that the pre-merger negotiations and understandings were committed to writing, even if, as Mr. Malone suggests, the written documents did not accurately reflect the intent.

Jack Gallivan (the other central negotiator) testified under oath that there were no "oral agreements at all" with TCI regarding the management and future ownership of the *Tribune*, "just a mutual understanding with Malone and Magness [another principal at TCI who has since passed away] that they weren't going to bother us, they weren't going to interrupt the management of the Tribune."  (Gallivan Mar. 12, 2002 Dep. at 73 (attached as Ex. 1 to KTLLC/MNG's Mot. Summ. J.).)  He also testified that there were no agreements relating to the future purchase of the *Tribune* beyond the Option Agreement and that as an individual he had no authority to bind KT Corp or TCI to any merger-related deal.  (Gallivan July 21, 2004 Dep. at 178, 191-92, 303, 305 (attached as Ex. 3 to KTLLC/MNG's Mot. Summ. J.).)  In his most recent declaration, Mr. Gallivan states,

> While I have previously testified that there were no other agreements than the Merger, Management and Option agreements, to be clear I repeatedly told the McCarthey family both orally and in writing that those agreements were ironclad and gave [the McCartheys] absolute assurances (expressed to me by Malone and Magness) that TCI would perform those agreements precisely as intended.

---

[17]Pages 103 and 104 of Mr. Malone's April 2, 2002 Deposition Transcript were submitted by the McCartheys during the hearing, and the court includes them as part of the record.

(Gallivan July 8, 2005 Decl. ¶ 15.)  But he also reiterates that he "did not have the authority to bind TCI or KT with respect to the assurances and promises made to [him] by Magness and Malone [of TCI] . . . ."  (Id. ¶ 17.)  Instead, he was "authorized to communicate."  (McCartheys' Opp'n at xii.)

Dominic Welch, who was in 1997 the President of KTCorp and after the Merger was the first CEO of SLTPC, confirms that Mr. Gallivan was acting "as an emissary and communicator" in the negotiations.  (Welch July 6, 2005 Decl. ¶ 19.)  There is no contention that Mr. Gallivan had authority to bind KTCorp or any party in the negotiations.  (See generally id.)  Mr. Welch, who was also involved in the negotiations, further testified that:

> In 1997, the KT board and the McCarthey Family adopted a business arrangement where the McCartheys and other KT shareholders would transfer their KT shares to TCI in consideration for TCI shares, an option to purchase the *Tribune* at the end of five years and rights to manage the *Tribune* pending reacquisition.  The understandings and agreements with TCI were negotiated by Mr. Gallivan, John Malone, Donne Fisher, and myself.  Our respective in-house and outside legal counsel were instructed and <u>presumed by all of us</u> to have <u>prepared legal documents that would adequately and fully reflect our mutual understandings and agreements.  These understandings included the promises and assurances that Mr. Gallivan provided separately to the McCartheys to induce them to change their opposition to a merger with TCI, to approve the merger with TCI, and to convey all of the McCarthey Family's holdings and interests in the KT stock to TCI.</u>

(Id. ¶ 22 (emphasis added).)

In the testimony there is no mention of a separate oral agreement with distinct terms—merely promises that the other party would faithfully abide by the written agreements related to the Merger.  Assurances from Mr. Gallivan to the McCartheys that the deal was "ironclad" and would be performed "precisely as intended" by TCI add nothing to the

McCartheys' claim that a collateral oral agreement existed.[18]

Ultimately, the documents and testimony in the record establish that no separate oral

agreement existed.  Essentially, the McCartheys are complaining that their intent was not

properly documented by the other negotiators and attorneys when the Management and Option

Agreements were drafted and executed.  And they are unhappy with the result of court rulings in

the SLTPC litigation.  For instance, they allege that:

> It was never discussed, agreed, or contemplated by the parties that valuation of the
> option exercise price would be based on speculative assumptions concerning a
> hypothetical financial performance which *might* be achieved if dramatic changes
> *were* made to the *Tribune* and its operations.  Further, it was never discussed,
> agreed, or contemplated by the parties that the Tribune would be valued based on
> the highest conceivable price which might be paid by a single buyer under
> individualized circumstances.  It was never discussed, agreed, or contemplated by
> the parties that the result of a third valuation would be deemed an "arbitration"
> subject to narrowly circumscribed standards of judicial review.  If proposed
> valuation and appraisal methods of this type had been communicated to the
> McCartheys, the merger would not have occurred and the McCartheys would not
> have conveyed their KT shares to TCI.

(Counterclaim ¶ 55.)  The allegation alludes to language in the Option Agreement, the court's

interpretation of the Option Agreement language in the AT&T case, and the result of rulings in

the MPI case affecting the option exercise price.  Clearly the McCartheys are dissatisfied with the

Option Agreement and the outcomes of the SLTPC litigation.  But their complaint is ultimately

that the written agreements (in particular, the Option Agreement) do not reflect the intent of the

_____

[18]Indeed, the McCartheys, in their opposition, expressly state that "promises or
agreements relating to the *Tribune* were made by TCI's Malone to Gallivan and thereafter
conveyed by Gallivan to the McCartheys that TCI would perform the Merger, Management and
Option Agreements in a commercially reasonable, fair and good faith manner, and would not
exploit any drafting deficiencies in the documents . . . ." (McCartheys' Opp'n at xv ¶ 11
(emphasis added).)

individuals who were involved in the 1997 negotiations.  Their dissatisfaction is not evidence of a separate agreement.

The McCartheys agreed upon the means to carry out the deal—that is, the written agreements.  The pre-merger negotiations were intended to be encompassed—and ultimately were encompassed—in the final written contracts (the Merger, Option, and Management Agreements).  Subsequent dissatisfaction with negotiation trade-offs, court interpretations of provisions, or drafting decisions in the final contract do not give the disappointed parties—here, the McCartheys—the power to revive preliminary negotiations and re-cast them as a binding contract.  If the written merger documents did not work (that is, if they "failed" as "mechanisms," as the McCartheys assert (see Tr. at 48)), that does not allow the McCartheys to have a second bite at the apple.  (See McCartheys' Opp'n at 3 (asserting that the Family Agreement was breached because KTLLC "fail[ed] to allow SLTPC to reacquire the *Tribune* at a standard practice fair market value");  Fourth Am. Compl. in the <u>AT&T</u> case, Dkt. # 266, ¶¶ 160-65 (asserting claim by SLTPC for breach of the covenant of good faith and fair dealing underlying the Option Agreement).)

### 2. Even if the Family Agreement Exists, it Violates the Statute of Frauds.

In the alternative, even if the Family Agreement exists as a collateral agreement, it is nevertheless unenforceable because it violates the Statute of Frauds.  Specifically, under Utah Code Ann. §§ 25-5-3 and 25-5-4, the Family Agreement is unenforceable because it is an oral agreement that cannot be performed within one year of the making of the agreement (that is, it was formed in 1997 and includes an option that could not be exercised before 2002).  See, e.g.,

Coulter & Smith, Ltd. v. Russell, 976 P.2d 1218, 1222 (Utah Ct. App. 1999) (holding that an

option contract is subject to the Statute of Frauds).

      The McCartheys do not dispute that the Family Agreement, to the extent it exists, is oral

and normally would be subject to the Statute of Frauds.  But they raise the defense of part

performance, which, under certain circumstances, removes an agreement from operation of the

Statute of Frauds.  Under that doctrine, a contract otherwise invalid under the Statute of Frauds

may nevertheless be specifically enforced by the court if there has been partial performance of

the contract by the party seeking to enforce the oral agreement.  See Utah Code Ann. § 25-5-8

("Nothing in this chapter [Statute of Frauds] shall be construed to abridge the powers of courts to

compel the specific performance of agreements in case of part performance thereof.");  Spears v.

Warr, 44 P.3d 742, 751 (Utah 2002) (setting forth contours of doctrine of part performance).[19]

According to the Utah Supreme Court,

> [t]he standard for sufficient partial performance in Utah is as follows:
>
> > [1] the oral contract and its terms must be clear and definite; [2] the acts done in
> > performance of the contract must be equally clear and definite; and [3] the acts
> > must be in reliance on the [oral] contract.  Such acts in reliance must be such that
> > (a) they would not have been performed had the contract not existed, and (b) the
> > failure to perform on the part of the promisor would result in fraud on the
> > performer who relied, since damages would be inadequate.  Reliance may be
> > made in innumerable ways, all of which could refer exclusively to the contract.
>
> We have also indicated that evidence of partial performance must be "strong" and we
> expressed a preference for "acts-oriented rather than word-oriented" evidence.  In
> explaining the significance of exclusively referable part performance evidence, we stated
> [in Martin v. Scholl, 678 P.2d 274 (Utah 1983)]:

_____

    [19]Abrogated on unrelated grounds.

"[A]cts of part performance must be exclusively referable to the contract. . . ."

We also explained, however, that . . . "the more conclusive the direct proof of the contract, the less stringent the requirement of exclusively referable acts."

Spears, 44 P.3d at 751 (emphasis added)(internal citations omitted).  "Exclusive referable acts of reliance" are acts that cannot be explained on any other ground but the existence of the oral agreement.  Martin v. Scholl, 678 P.2d 274, 275, 277 (Utah 1983).[20]  "If the acts relied on were not done in the execution of the oral contract but can be explained on another ground, they are insufficient to remove the bar of the statute of frauds, and the contract is unenforceable." McDonald v. Barton Bros. Inv. Corp., 631 P.2d 851, 853 (Utah 1981).  "The requirement overcomes the court's reluctance to prevent the statute from operating on the basis of purely oral evidence."  Martin, 678 P.2d at 278.

In the McCartheys' opposition brief, they list several actions that they say were performed in reliance on the terms and conditions of the alleged Family Agreement: (1) voting as members of the KTCorp Board to approve the merger; (2) voting their shares in favor of the TCI-KTCorp merger and conveying those shares to TCI in the merger; (3) forming SLTPC; (4) setting aside assets "to fund the exercise of the option"; (5) causing "the McCartheys' designated entity,

---

[20]It appears that the part performance doctrine applies not just to oral contracts regarding conveyance of real property but to other types of contracts that would otherwise be subject to the statute of frauds.  See Utah Code Ann. § 25-5-8 ("Nothing in this chapter . . .") (emphasis added); Jenkins v. Percival, 962 P.2d 796 (Utah 1998) (applying doctrine of part performance in context of agreement to arbitrate a tort settlement); Randall v. Tracy Collins Trust Co., 305 P.2d 480 (Utah 1956) (applying doctrine to agreement to transfer stock and real property); Fisher v. Fisher, 907 P.2d 1172 (Utah Ct. App. 1995) (applying doctrine to oral modification of escrow agreement).

SLTPC," to give notice of its intent to "purchase the Tribune assets at their fair market value as of July 31, 2002, pursuant to the Option Agreement"; and (6) causing SLTPC to appoint an outside appraiser to value the Tribune Assets.  (See McCartheys' Opp'n at 11-12 (emphasis added).)  The circumstances presented by the McCartheys in their opposition memorandum do not satisfy the requirements of the doctrine of part performance because they do not show exclusive referable acts of reliance.

The McCartheys' relinquishment of their controlling interest in KTCorp and their subsequent formation of SLTPC, as well as the other acts, are equally consistent with the written contracts relating to the merger and disposition of the *Tribune*.  For example, the McCartheys' KTCorp stock was the subject of the Voting Agreement—a written agreement that required the McCarthey Family Trust to vote its shares in favor of the merger, convey its stock to TCI, and renounce dissenting shareholder rights.  And the formation of SLTPC and SLTPC's efforts to exercise the option are consistent with the written Option Agreement on the same subject matter. The acts are not exclusively referable to an alleged oral contract and so the McCartheys may not rely on the doctrine of part performance to avoid the Statute of Frauds.  See, e.g., Martin, 678 P.2d at 274-75, 279 (holding that ranch laborer's working long hours and declining better offers of employment elsewhere were consistent with his pre-existing employment as foreman and so were not acts exclusively referable to the alleged oral contract to convey ranch land);  Coleman v. Dillman, 624 P.2d 713, 715 (Utah 1981) (finding that plaintiff's possession of house was not exclusively referable act to purported oral purchase contract because it was equally consonant with rental agreement).  See also Bradshaw v. McBride, 649 P.2d 74, 80 (Utah 1982) (refusing to enforce alleged oral contract where part performance not exclusively referable to it); McDonald

v. Barton Bros. Inv. Corp., 631 P.2d 851, 853 (Utah 1981) (same); Holmgren Bros. Inc. v.

Ballard, 534 P.2d 611, 614-15 (Utah 1975) (same).

The McCartheys argue that their part performance argument should be evaluated under a

"more relaxed standard regarding 'exclusively referable acts.'"  (McCartheys' Opp'n at 12 (citing

Spears, 44 P.3d at 751).)  But relaxation of the exclusively referable acts standard is one that

occurs where there is "no evidentiary concern regarding the existence of a contract."  Martin, 678

P.2d at 279.  "[T]he requirement of exclusively referable acts has been relaxed . . . where the

contract is admitted or strong independent acts . . . prove the contract exists."  Id. at 277.  In this

case, there has been no such admission regarding the existence of the alleged oral agreement.

Where the existence of an oral contract is "vigorously disputed," "the necessity of showing acts

of part performance which were exclusively referable to the claimed agreement remains vital."

Id. at 279.

For the reasons stated above, the McCartheys' alleged Family Agreement is invalid under

the Statute of Frauds.

## C.    **The McCartheys' Tort Claims**

In addition to their contract claims, the McCartheys bring the following tort claims

against various counterclaim defendants and third-party defendants: interference with contract,

interference with prospective economic advantage, civil conspiracy to interfere with contract, and

aiding and abetting interference with contract.  The Counterclaim Defendants and Third-Party

Defendants contend that the tort claims fail as a matter of law because, among other things, they

depend on the existence of an enforceable agreement.

39

During the hearing on the motions, the McCartheys conceded that their tort claims

necessarily rely on the existence of the Family Agreement.  (See Tr. at 94-96, 108 ("The tort

claims [including interference with prospective economic relations] are predicated on [the]

existence of the Family Agreement.").)  Because the court finds that no Family Agreement exists,

the McCartheys' tort claims are dismissed.

**D.**     **The McCartheys' Equitable Claims of Promissory Estoppel and Unjust Enrichment**

The McCartheys assert claims of promissory estoppel and unjust enrichment in their

Counterclaim and Third-Party Complaint.

**1.**     **Promissory Estoppel**

The McCartheys assert a claim of promissory estoppel against KTLLC and MNG.  The

McCartheys' promissory estoppel claim is a claim in equity, for which they seek an equitable

remedy.  See UTCO Assocs., Ltd. v. Zimmerman, 27 P.3d 177, 180 (Utah Ct. App. 2001)

("Promissory estoppel is an equitable doctrine.").

> Under Utah law, the elements of promissory estoppel are: (1) The promisee acted
> with prudence and in reasonable reliance on a promise made by the promisor;
> (2) the promisor knew that the promisee had relied on the promise which the
> promisor should reasonably expect to induce action or forbearance on the part of
> the promisee or a third person; (3) the promisor was aware of all material facts;
> and (4) the promisee relied on the promise and the reliance resulted in a loss to the
> promisee.

Lantec, Inc. v. Novell, Inc., 306 F.3d 1003, 1020-21 (10th Cir. 2002) (emphasis added) (citing

J.R. Simplot Co. v. Sales King Int'l, Inc., 17 P.3d 1100, 1107 (Utah 2000)).  The promise must

be reasonably clear and definite.  Id. at 1021.  According to the McCartheys,

> [u]nder the terms of the Family Agreement, KT and TCI made clear promises to maintain the assets of the *Tribune* without material change during the period of the Option Agreement, to permit SLTPC to continue to manage the *Tribune* until reacquisition of the *Tribune* by the Family or its affiliates and to reconvey the *Tribune* to its prior owners at a fair price after the period imposed by tax considerations.

(Counterclaim ¶ 238.)  The McCartheys allege that "KTLLC and MNG succeeded to the obligations of TCI and KT under the Family Agreement" (id. ¶ 237) and accordingly are bound by the "clear promises" allegedly made by TCI and KT.

The court disagrees.  The lack of evidence of a promise and the availability of a remedy at law preclude the McCartheys' equitable claim.

The first element of a claim for promissory estoppel is a promise.  Lantec, 306 F.3d at 1020-21.  From a purely factual point of view, any promise allegedly made in February 1997 was not made by KTLLC or MNG.  Neither KTLLC nor MNG was a player at the time.  The McCartheys attempt to get around that fact by contending that KTLLC and MNG are "successors in interest" to KTCorp and TCI.  According to the McCartheys, KTLLC and MNG, as successors, are bound as a matter of law by TCI's and KTCorp's alleged oral promises.  Even assuming (without deciding) that KTLLC and MNG succeeded to the obligations of TCI and KTCorp when the merger and subsequent sale of the *Tribune* to MNG occurred,[21] the McCartheys' equitable claim for promissory estoppel fails.

The McCartheys ask the court exercise its equitable powers to "fashion a remedy that

_____

[21]The court questions whether a corporation succeeding to express contractual obligations also would be liable for its corporate predecessor's promises in the quasi-contract context.  But given other problems with the McCartheys' promissory estoppel claim, the issue need not be addressed.

enforces the promises made by KT and TCI under the Family Agreement, returns ownership of

the *Tribune* or key *Tribune* assets, including the masthead, to the McCartheys for a reasonable

price based on fair market value and awards the McCartheys consequential damages."

(Counterclaim ¶ 242 (emphasis added).)  The equitable relief requested by the McCartheys is

inconsistent with their characterization of the alleged promises underlying the Family

Agreement.[22]  One alleged promise purportedly promised a sale of the *Tribune* assets to SLTPC,

not to the McCartheys as individuals.  (See Counterclaim ¶ 54(c) (alleging that terms and

conditions of Family Agreement included the promise that "a new entity, yet to be created by

certain shareholders of KT, would have the right to reacquire the *Tribune* at the end of the period

imposed by tax considerations").  The McCartheys never contemplated that they would receive

the assets as individuals.  What the McCartheys really seek is a sale of the *Tribune* to SLTPC

(the "new entity") at what they consider to be a fair market price.  Such a sale would satisfy their

goal of restoring the family legacy in the newspaper.

But that remedy is already available at law through the Option Agreement.  "In general,

the law will not imply an equitable remedy when there is an adequate remedy at law." UTCO

Assocs., 27 P.3d at 180.  The existence of the written Option Agreement precludes the

McCartheys' claim for promissory estoppel against both KTLLC and MNG.  Mann v. American

W. Life Ins. Co., 586 P.2d 461, 465 (Utah 1978) ("Recovery in quasi contract is not available

where there is an express contract covering the subject matter of the litigation.").

---

[22]The McCartheys vacillate in their court papers between asserting their rights as individuals and asserting SLTPC's rights (the entity created and purportedly controlled by the McCartheys).  This is confusing and indicative of the inherent problem with their claims.

Moreover, there is no evidence that KTCorp made any separate oral promise to the McCartheys.  Indeed, Mr. Gallivan did not have authority to bind KTCorp, and both he and Mr. Malone stated that there was no collateral oral agreement.  Everything they testify about refers back to the written documents.  Even if the McCartheys thought that Mr. Malone and Mr. Gallivan had made such a promise, their "subjective understanding of the promisor's statements cannot, without more, support a promissory estoppel claim."  Lantec, 306 F.3d at 1021 (internal citations and quotation marks omitted).  And the court has already found that there was no collateral oral agreement because any promise made was expressed in writing or extinguished by the integration clauses of the written documents.

For these reasons, KTLLC and MNG are entitled to summary judgment on the McCartheys' promissory estoppel claim.

### 2.        Unjust Enrichment

The McCartheys assert a claim of unjust enrichment against KTLLC, MNG, Deseret News Publishing Company (DNPC) and Deseret Management Company (DMC).

> In order to prevail on a claim for unjust enrichment, three elements must be met.  First, there must be a benefit conferred on one person by another.  Second, the conferee must appreciate or have knowledge of the benefit.  Finally, there must be "the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value."  The plaintiff must prove all three elements to sustain a claim of unjust enrichment.

Desert Miriah, Inc. v. B&L Auto, Inc., 12 P.3d 580, 582 (Utah 2000) (quoting Berrett v. Stevens, 690 P.2d 553, 557 (Utah 1984)).

       a.       <u>The McCartheys' claim against KTLLC and MNG</u>

The McCartheys' unjust enrichment claim against KTLLC and MNG fails as a matter of law.  As noted above, a remedy at law is available.  <u>See</u> <u>American Towers Owners Ass'n, Inc. v. CCI Mechanical, Inc.</u>, 930 P.2d 1182, 1193 (Utah 1996) ("The doctrine [of unjust enrichment] is designed to provide an equitable remedy where one does not exist at law.  In other words, if a legal remedy is available, such as breach of an express contract, the law will not imply the equitable remedy of unjust enrichment.").  Accordingly, KTLLC and MNG are entitled to summary judgment on this claim.

       b.       <u>The McCartheys' claim against DNPC and DMC</u>

           i.       DNPC

DNPC filed a motion for summary judgment challenging the McCartheys' unjust enrichment claim.  In particular, DNPC contends that the McCartheys do not present any evidence that they themselves conferred a benefit on DNPC.  One of the elements of an unjust enrichment claim is that the claimant must show that it conferred a benefit on the party against whom it brings the claim.  <u>See</u> <u>Desert Miriah</u>, 12 P.3d at 582.

In their opposition brief, the McCartheys assert that:

> DNPC supported MNG in defeating the Family Agreement on the condition that MNG make amendments to the 1982 JOA [Joint Operating Agreement] that would confer additional rights and remedies to DNPC and that would unlawfully infringe upon the Management and Option Agreements.  The record facts demonstrate that <u>DNPC received assurances that MNG would make</u> what DNPC considered to be valuable JOA amendments. . . . These amendments certainly enriched DNPC's position under the JOA <u>at the expense of the McCartheys</u> who were assured in the Family Agreement that the *Tribune* assets would not be materially altered before SLTPC reacquired the *Tribune*.

(McCartheys' Mem. Opp'n to DNPC's Mot. Summ. J. at 22-23 (emphasis added) (internal citations omitted).)  According to the McCartheys, the alleged benefit was conferred by MNG, not the McCartheys. This does not satisfy the first element of an unjust enrichment claim.

Still, the McCartheys assert that they may prevail on an unjust enrichment claim even if they were not the ones who conferred the benefit on DNPC.  This is incorrect.  See, e.g., American Towers, 930 P.2d at 1182 (holding that plaintiff's unjust enrichment claim failed as a matter of law because "plaintiff conferred no benefit upon defendants");  Berrett v. Stevens, 690 P.2d 553, 557 (Utah 1984) ("It must first be determined whether a benefit has been conferred on [the party allegedly retaining the benefit] by [the party claiming unjust enrichment].");  Knight v. Post, 748 P.2d 1097, 1100 (Utah Ct. App. 1988) (same).

Because the McCartheys' claim fails as a matter of law under the first element of unjust enrichment, their claim against DNPC must be dismissed.

> ii.    DMC

The McCartheys also assert a claim for unjust enrichment against DMC.  According to the McCartheys' Third-Party Complaint, DMC (through its Executive Committee) interfered, aided and abetted, and conspired "with MNG, KTLLC and others to block, obstruct and prevent return [of] ownership of the *Tribune* to the Family or its affiliates after June 30, 2002," and, consequently, benefitted by and was unjustly enriched by its actions.  (Third-Party Compl. ¶ 235.)  Specifically, DMC allegedly unjustly benefitted from its "blocking, obstructing and destroying the Option and the Family Agreement," which actions resulted in DMC's "enhancing or acquiring various ownership interests in jointly owned or stand alone assets to print, publish

and distribute the *Tribune* after June 30, 2002." (Id. ¶ 240.)  DMC, through its motion to dismiss,[23] challenges the McCartheys' unjust enrichment claim.

The McCartheys' claim fails as a matter of law for the same reasons that the McCartheys' claim fails against DNPC.  As noted above, one of the elements of unjust enrichment is that "there must be a benefit conferred on one person by another." Desert Miriah, 12 P.3d at 582. The McCartheys allege that DMC's action resulted in a benefit to DMC at the expense of the McCartheys.  They do not allege that they conferred any benefit on DMC.  As a matter of law, the McCartheys may not succeed on an unjust enrichment claim by asserting that DMC obtained a benefit through its own actions or the actions of a third party.

Accordingly, the McCartheys' claim for unjust enrichment against DMC is dismissed for failure to state a claim upon which relief may be granted.[24]

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.      Kearns-Tribune's and MNG's Motion for Summary Judgment (Dkt # 48) is GRANTED.

---

[23]The standard under Rule 12(b)(6), rather than the standard for summary judgment (Rule 56), applies here.

[24]DMC did not expressly raise this legal issue as a basis for dismissal in its motion (instead, DMC challenged the McCartheys' claim on the basis that DMC is not liable as the parent of its subsidiary, DNPC).  But the legal issue was raised by DNPC (the allegations against DMC track those against DNPC), and the McCartheys addressed the issue in their opposition to DNPC's motion for summary judgment.  Accordingly, the McCartheys had a full and fair opportunity to challenge the court's basis for dismissal of DMC's claim.

2.      Dirks, Van Essen & Murray's joinder in the Kearns-Tribune/MNG motion for summary judgment (Dkt # 54) is GRANTED.

3.      DNPC's Motion for Summary Judgment (Dkt # 44) is GRANTED.

4.      DMC's Motion to Dismiss, or in the Alternative, Motion for More Definite Statement (Dkt # 46) is GRANTED.

5.      AT&T's and Comcast's Motion to Dismiss and Joinder in Motions for Summary Judgment filed by Kearns-Tribune/MNG and DNPC (Dkt # 58) are GRANTED.

6.      R. Gary Gomm's Motion for Summary Judgment, or, in the Alternative, Motion to Dismiss (Dkt # 60) is GRANTED.

7.      The McCarthey Family's Request for Judicial Notice of Adjudicative Facts (Dkt # 127) is DENIED.

8.      The McCarthey Family's Motion for Leave to Supplement the Record and Second Notice of Supplemental Authorities (Dkt # 136) is DENIED.

DATED this 24th day of April, 2006.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge

47